Patrick J. CONNOLLY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 406–81C.

United States Claims Court.

Dec. 15, 1982.

Alan E. Wolin, Mineola, N.Y., for plaintiff; Wolin & Wolin, Mineola, N.Y., of counsel.

Sara V. Greenberg, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

Prior to the effective date of the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25, the parties filed cross motions for summary judgment. Because defendant's motion, in part, challenges the court's jurisdiction to grant the relief requested by plaintiff, the court treats it as a motion to dismiss pursuant to Rule 12(b).

## FACTS [1]

Plaintiff is a former probationary employee of the United States Postal Service.

---

1. The facts recited in the complaint and attachments thereto are deemed established for the purpose of this motion only. *See Prairie v.*

*United States,* 224 Ct.Cl. 735, 735 (1980); *Featheringill v. United States,* 217 Ct.Cl. 24, 26 (1978).

He was hired on April 4, 1981, as a postal distribution clerk at the main post office in Flagstaff, Arizona. His duties involved sorting and casing mail, and various activities requiring physical exertion such as lifting and pushing of heavy objects. Complaint ¶ 5. After about two weeks, plaintiff developed numbness in his fingers and a throbbing pain in his forearms. The condition was diagnosed on May 12, 1981, as a bilateral Carpal Tunnel Syndrome and the examining physician concluded that the condition was caused by plaintiff's employment. Complaint ¶¶ 6, 12, 13.

Prior to this diagnosis, on May 4, 1981, plaintiff was given a 30-day performance evaluation. The evaluation rated plaintiff as unsatisfactory in "productivity and work habits" and in "safety." The evaluation also noted that plaintiff had initially experienced difficulty in accepting criticism but had since improved. On May 13, 1981, plaintiff received a second evaluation which repeated the unsatisfactory ratings in "productivity and work habits" and "safety." In addition, it rated him unsatisfactory in "attitude towards work—coworkers—supervisors" and "acceptance of criticism," stating that "improvement noted in 1st eval[uation] has stopped." The following day, plaintiff was separated from the Postal Service. The removal letter, signed by A.W. Baker, MSC Manager/Postmaster, listed as reasons for the separation that plaintiff had been rated unsatisfactory in several areas of performance and had shown lack of improvement.

Plaintiff brought suit seeking reinstatement with back pay, correction of his personnel records, $2 million in damages ($1 million compensatory and $1 million punitive), costs and attorneys' fees. Plaintiff argues that the adverse evaluations were "motivated solely by malice and bad faith and were intended in part to be in reprisal for plaintiff's job-related injury, compensation claim and complaints about the absence of safety procedure." Complaint ¶ 34.

Defendant has moved for dismissal, claiming *inter alia* that the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111, establishes a comprehensive scheme for dealing with federal employees who complain that they have suffered improper treatment at the hands of their supervisors. It argues that this scheme does not entitle probationary employees to seek relief in this court.

## DISCUSSION

■ In determining a plaintiff's entitlement to relief, one must start with the proposition that this is a court of very limited jurisdiction. Because all claims brought are against the United States and therefore involve a waiver of sovereign immunity, *Porter v. United States,* 204 Ct.Cl. 355, 359 (1974); *National State Bank of Newark v. United States,* 174 Ct.Cl. 872, 876, 357 F.2d 704 (1966), the court must exercise not only the traditional reluctance of federal courts to act absent specific statutory authorization, *Cary v. Curtis,* 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845); *Ex parte Bollman,* 8 U.S. (4 Cranch) 75, 93, 2 L.Ed. 554 (1807), but an additional measure of restraint growing from the principle that waivers of sovereign immunity must be narrowly construed. *See United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); *United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941); *Kabua Kabua v. United States,* 212 Ct.Cl. 160, 167, 546 F.2d 381 (1976), *cert. denied,* 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977).

■ Plaintiff brought this action under the Tucker Act, 28 U.S.C. § 1491, which provides that we may "render judgment upon any claim against the United States founded ... upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States ...." As the Supreme Court has noted, "[t]he Tucker Act ... is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. The Court of Claims has recognized that the Act merely confers jurisdiction upon it whenever the substantive right exists." *United*

*States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976), citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–07, 372 F.2d 1002 (1967). *See also Griffin v. United States,* 215 Ct.Cl. 710, 713 (1978).

■ Plaintiff's claim is not under a contract with the United States since it is well established that the federal employment relationship is a statutory rather than contractual one. *See Kania v. United States,* 227 Ct.Cl. ——, ——, 650 F.2d 264, 268, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981); *Shaw v. United States,* 226 Ct.Cl. ——, ——, 640 F.2d 1254, 1260 (1981). Plaintiff's claim must therefore arise, if at all, under the Constitution, an Act of Congress or a regulation of an executive department. These possibilities are considered in reverse order.

## I. *A Regulation of an Executive Department*

■ Plaintiff argues that in dismissing him, USPS failed to comply with provisions of its Employee & Labor Relations Manual. At oral argument, defendant conceded that the Manual is properly considered a regulation of USPS. *But see McGrath v. United States,* 2 USCCR No. 11, at 6 (December 1, 1982) (SETO, J.) (Federal Personnel Manual held not to be a regulation). *See generally Fiorentino v. United States,* 221 Ct.Cl. 545, 551–54, 607 F.2d 963 (1979) (discussion of when government "manuals, handbooks, and in-house publications" have binding effect).

Even assuming the manual to be a regulation, it does not necessarily form the basis for an action in the Claims Court because the Tucker Act expressly limits jurisdiction to claims based on regulations of an executive department. The term "executive department" is not defined within Title 28, but section 451 defines "department" by

reference to the definition in Title 5 of the Code, "unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government."

Nothing in section 1491 suggests that the term "executive department" as there used refers to the executive branch as a whole. The term quite clearly denotes a subdivision of the executive branch because the section refers to *an* executive department, suggesting the existence of several. While it makes perfect sense—and comports with established usage, *see, e.g., United States v. Germaine,* 99 U.S. 508, 510–11, 25 L.Ed. 482 (1878)—to refer to several executive *departments,* it would be totally nonsensical to read the section as referring to several executive *branches.* Thus, in determining whether a regulation can form the basis for suit under the Tucker Act, the court must, pursuant to 28 U.S.C. § 451, refer to Chapter 1 of Title 5.

Section 101 of Title 5 defines the term "executive department" to include the cabinet level departments. The United States Post Office is not among them. In fact, the Postal Reorganization Act of 1970 explicitly struck the Post Office from this list. Pub.L. No. 91–375, § 6(c)(1), 84 Stat. 719, 775. The status of the Post Office is now defined in 39 U.S.C. § 201 (1980) as "an independent establishment of the executive branch of the Government of the United States ...." It follows that the Post Office is not an executive department and that its regulations cannot form the basis for plaintiff's claim under the Tucker Act.[2]

■ This does not, of course, mean that the Post Office may ignore its regulations. It is well established that a department or agency is bound by the regulations it promulgates. *See, e.g., Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403

---

**2.** It is not clear whether plaintiff is also making a claim under regulations issued by the Office of Personnel Management pertaining to probationary employees. Defendant correctly points out, however, that postal service employees are specifically excluded from coverage by those regulations. 39 U.S.C. § 410. In any case, by virtue of the analysis in the text, OPM regulations would not appear to form an appropriate basis for assertion of jurisdiction under the Tucker Act. *See* 5 U.S.C. §§ 101, 104, 1101. *See generally* 26 Op. Att'y Gen. 209, 210–11 (1907).

(1957); *Cruz-Casado v. United States,* 213 Ct.Cl. 498, 502–03, 553 F.2d 672 (1977). However, an alleged violation of USPS regulations cannot form the basis for jurisdiction in this court. Of course, if jurisdiction is established on some other basis, plaintiff may rely on any regulation applicable to him in seeking relief.

## II. *An Act of Congress*

■ In 1978 Congress enacted the Civil Service Reform Act (the Act or CSRA) as a comprehensive revision of the laws pertaining to the civil service. This case presents the issue left open by the Court of Claims in *Montalvo v. United States,* No. 675–81C, order at 6–7 (Ct.Cl. Sept. 10, 1982) (order granting summary judgment), whether, after passage of the Civil Service Reform Act, a probationary employee may bring an action in this court seeking review of an agency's decision to dismiss him.[3]

### A.

■ The Civil Service Reform Act does not, on its face, allow probationary employees to bring a claim under the Tucker Act. The CSRA merely provides that before receiving a permanent appointment, employees will serve a probationary period, subject to the President's broad power to regulate the terms and conditions of probationary employment. 5 U.S.C. § 3321(a).[4] The absence of an express statutory provision does not, however, automatically foreclose jurisdiction under the Tucker Act. Decisions of

3. In *Montalvo* the issue was considered by an in-chambers panel during the last month of the Court of Claims' existence. The court wisely felt that resolution of such an important question should be reserved for a determination based upon full oral argument before the new Federal Circuit which would have appellate jurisdiction over all matters under the CSRA. Order at 6–7. This court does not read this ruling as precluding consideration of the issue but, rather, as an invitation to treat the matter with the care and deliberation it deserves.

4. This absence of an express statutory entitlement stands in sharp contrast to other provisions pertaining to the civil service, *e.g.,* 5 U.S.C. §§ 8715, 8912, which clearly evince a congressional intent that this court have jurisdiction.

the Court of Claims have left open the possibility that jurisdiction may be based upon legislation which "can fairly be interpreted as mandating compensation by the Federal Government." *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002 (1967).

Although the *Eastport Steamship* standard has been frequently cited by the Court of Claims, *e.g., Barber v. United States,* 230 Ct.Cl. ——, ——, 676 F.2d 651, 654 (1982); *Duncan v. United States,* 229 Ct.Cl. ——, ——, 667 F.2d 36, 47 (1981); *Adair v. United States,* 227 Ct.Cl. ——, ——, 648 F.2d 1318, 1322 (1981), the cases provide little guidance as to what methodology to follow in determining whether a statute may fairly be interpreted as creating a right to proceed under the Tucker Act. Fortunately, the applicable principles have been comprehensively set forth by the Supreme Court in a line of cases starting with *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

*Cort v. Ash* and its progeny deal with the question of when statutes implicitly create private rights of action. The cases deal with situations where Congress has created certain rights or benefits, but has failed to expressly authorize the federal courts to entertain actions by the beneficiaries to enforce those rights.[5]

■ *Cort* establishes a four-part test to determine whether a right of action may be inferred:

5. The *Cort v. Ash* line of cases points out the subtle but important distinction between congressional intent to create a substantive entitlement and the intent to create a right to enforce that entitlement by suit in federal court. Congress frequently creates entitlements which it entrusts wholly to the administrative process. *See* p. 1258 & n. 8 *infra.* In determining whether suit may be brought under 28 U.S.C. § 1491, the court must therefore be careful to determine not only whether Congress intended that the plaintiff be the beneficiary of an entitlement, but also whether it intended that he be able to enforce such entitlement by suit for money damages in this court. *See United States v. Testan,* 424 U.S. at 400–02, 96 S.Ct. at 954–955.

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39 [36 S.Ct. 482, 484, 60 L.Ed. 874] (1916) (emphasis supplied)— that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e.g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 458, 460 [94 S.Ct. 690, 694, 38 L.Ed.2d 646] (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e.g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 423 [95 S.Ct. 1733, 1740, 44 L.Ed.2d 263] (1975); *Calhoon v. Harvey,* 379 U.S. 134 [85 S.Ct. 292, 13 L.Ed.2d 190] (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action solely on federal law?

422 U.S. at 78, 95 S.Ct. at 2087. Naturally, in a case such as this, involving the federal employment relationship which is created wholly by federal statute, only the first three of the *Cort* factors have relevance.

Over the years, the Court has clarified the *Cort v. Ash* test. Thus, in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979), the Court noted that the factors are not all entitled to equal weight:

> The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and

its purpose, see 422 U.S., at 78 [95 S.Ct., at 2087]—are ones traditionally relied upon in determining legislative intent.

The *Cort* test has, moreover, proved to be a stringent one and the Court has not lightly inferred congressional intent to create a private right of action. *See, e.g., Jackson Transit Authority v. Local 1285, Amalgamated Transit Union,* —— U.S. ——, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982); *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *Piper v. Chris-Craft Industries,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977).

### B.

The CSRA is the first major revamping of the federal service since its creation by the Pendleton Act of 1883, almost a century earlier. The Act was passed in response to persistent criticisms of the civil service. While it addressed a multitude of problems, two goals were viewed as paramount: (1) to define precisely and comprehensively the rights of federal employees and the principles under which the federal merit system would operate; and (2) to facilitate and expedite the process of dealing with unsatisfactory employees by broadening the authority of federal managers and by streamlining the administrative and judicial review process. To achieve these goals, the multitude of laws governing the civil service, haphazardly enacted over the years,[6] were carefully reviewed and amended by the Act.

---

**6.** *See, e.g.,* Civil Service (Pendleton) Act of 1883, ch. 27, 22 Stat. 403; Tenure of Office Act, ch. 154, 14 Stat. 430 (1867); Lloyd-LaFollette Act, ch. 389, § 6, 37 Stat. 555 (1912); Civil Service Retirement Act of 1930, ch. 349, 46 Stat. 468; Hatch Political Activity Act, ch. 410, 53 Stat. 1147 (1939); Veterans' Preference Act of 1944, ch. 287, 58 Stat. 387; Government Employees' Incentive Awards Act, ch. 1208,

§§ 301–307, 68 Stat. 1105, 1112–14 (1954); Government Employees' Training Act, Pub.L. No. 85–507, 72 Stat. 327 (1958); Dual Compensation Act, Pub.L. No. 88–448, 78 Stat. 484 (1964); Back Pay Act of 1966, Pub.L.No. 89–380, 80 Stat. 94; Federal Pay Comparability Act of 1970, Pub.L. No. 91–656, 84 Stat. 1946 (1971).

The move for reform began in June 1977 when President Carter established the Personnel Management Project under the direction of Dwight Ink. The project took five months to complete and involved 110 employees who staffed nine different task forces. Seventeen public hearings were held throughout the United States and approximately 7,000 individuals and 800 organizations participated in the consultation process. *See* S.Rep. No. 969, 95th Cong., 2d Sess. 13 (1978), U.S.Code Cong. & Admin. News 1978, p. 2723. When the project was completed, Mr. Ink could justly claim that this was "the most comprehensive review of the Federal civil service system ever undertaken." Letter from Dwight Ink to Allan K. Campbell, Chairman of the Civil Service Commission (Dec. 20, 1977), *reprinted in* 1 The President's Reorganization Project, Final Staff Report, before Table of Contents (December 1977) (the "Ink Report").

The project report, which comprises three volumes and almost a thousand pages, made numerous recommendations for reform. While the recommendations covered many areas, they were all designed to "help restore an appropriate balance between [the] sometimes competing needs for flexibility and efficiency on the one hand, and adequate safeguards on the other, in order to foster effective, fair management in the Federal Government." 1 Ink Report vii.

On the basis of the Ink Report, the President developed a legislative proposal which was submitted to Congress in March of 1978 as S. 2640. In his transmittal letter, the President stressed that the proposal, which was to be "the centerpiece of government reorganization during [his] term in office," was designed to correct the "bureaucratic maze which neglects merit, tolerates poor performance, permits abuse of legitimate employee rights, and mires every personnel action in red tape, delay and confusion." President's Message to Congress transmitting draft legislation, Mar. 2, 1978, *reprinted in* H.R.Doc. No. 299, 95th Cong., 2d Sess. 622 (1978).

While giving due consideration to the Ink Report and the President's recommenda-

tions, both Houses of Congress undertook independent and detailed examinations of the civil service system and the need for reform. The Senate Committee on Governmental Affairs held 12 days of public hearings, receiving testimony from 86 witnesses representing 55 organizations. *See* S.Rep. No. 969, *supra,* at 1–2. Senator Percy held four additional days of informal field hearings. *Hearings on S. 2640, S. 2707 and S. 2839 Before the Committee on Governmental Affairs,* 95th Cong., 2d Sess. (1978) (Appendix). Written responses were also received from 69 individuals and organizations. *Id.* The House held 13 days of hearings (six of these on location at various departments and agencies) and received the testimony of over 140 witnesses. In addition, written statements were received from 36 individuals and organizations. *Hearings on H.R. 11280 Before the Committee on Post Office and Civil Service,* 95th Cong., 2d Sess. (1978).

Subsequent to these hearings, the bills underwent five separate markup sessions in the Senate and ten in the House. Committee on Governmental Affairs, United States Senate, *Markup Session on S. 2640, Civil Service Reform Act of 1978* (unpublished transcript of May 22, June 7, 8, 12, 14, 1978); Committee on Post Office and Civil Service, U.S. House of Representatives, 95th Cong., 2d Sess., *Markup Meetings on H.R. 11280, A Bill to Reform the Civil Service Laws* (1978). The Committees produced lengthy reports which contained numerous separate and dissenting views. *See* S.Rep. Nos. 969, 1049, 95th Cong., 2d Sess. (1978); H.R.Rep. Nos. 920, 1396, 1403, 95th Cong., 2d Sess. (1978). The legislation was debated for six days on the House floor and for two days on the Senate floor. The combined legislative history (excluding the Ink Report) takes up almost 6,000 pages.

A careful review of this background to the Civil Service Reform Act leads to the inescapable conclusion that all participants considered the Act to be a comprehensive reorganization of the civil service system. *See, e.g.,* President's Message to Congress, Mar. 2, 1978, *supra,* at 623; President's

Message to Congress transmitting Reorganization Plan No. 2, May 23, 1978, *reprinted in* H.R.Doc. No. 341, 95th Cong., 2d Sess. 630, 631 (1978); 124 Cong.Rec. S14282 (daily ed. Aug. 24, 1978) (statement of Sen. Javits); 124 Cong.Rec. S17082–83 (daily ed. Oct. 4, 1978) (statement of Sen. Ribicoff); 124 Cong.Rec. H8462 (daily ed. Aug. 11, 1978) (statement of Rep. Udall); *Hearings on S. 2640, S. 2707 and S. 2830, supra,* at 59 (statement of James T. McIntyre, Jr., Director of OMB) (April 6, 1978).

When finally written into law, the CSRA introduced a number of concepts and procedures which were radically different from prior law. *E.g.,* 5 U.S.C. §§ 2301–05 (enumeration of merit systems principles and prohibited personnel practices); 5 U.S.C. §§ 3131–3597 (establishment of the Senior Executive Service). In other respects, the law was changed only slightly or was left totally unchanged. *E.g.,* 5 U.S.C. §§ 7321–27 (restrictions on employees' right to engage in political activities). However, it is clear that the Act as finally passed constituted a delicate balance between a multitude of competing interests and a carefully drawn compromise between sharply divergent views as to what rights ought to be afforded federal employees and how much leeway should be given supervisors in implementing personnel management policies.

In light of this history, the court must be exceedingly careful in interpreting the Act so as not to import into its painstakingly crafted scheme, procedures and remedies unintended by the Act's drafters and inconsistent with the balance it establishes. *Cf. Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (interpreting Title VII of Civil Rights Act as comprehensive scheme to redress federal employment discrimination).

#### C.

1. The court is persuaded that plaintiff is within the class of individuals for whose especial benefit the CSRA was enacted. *Cort,* 422 U.S. at 78, 95 S.Ct. at 2087. While the Act was designed to meet several competing goals, *see* pp. 1255–1257 *supra,* there can be little doubt that the rights and status of federal employees were seriously considered by the Congress and that substantial thought was given to securing those rights through mechanisms in the CSRA. While probationers constitute a subclass of the larger class of federal employees, they are not unintended or incidental beneficiaries of the Act. It therefore follows that the first test of *Cort* is met.

2. Plaintiff's claim fares considerably less well under the second test of *Cort.* 422 U.S. at 78, 95 S.Ct. at 2087. The statute and its legislative history reveal no congressional intent to grant probationers the right to a judicial remedy for dismissal. Indeed, there is much to suggest the contrary.

While treating probationary employees like other employees for most purposes, *see, e.g.,* 5 U.S.C. § 4301(2), the Act draws a sharp distinction in the treatment of these employees when they become the subject of an adverse action—a suspension, removal or reduction in grade. While tenured employees are afforded a panoply of rights for the more serious of these actions, including the right to 30 days' notice, to answer charges, to be represented by an attorney, to a written decision and ultimately to an appeal to the Merit Systems Protection Board, 5 U.S.C. § 7513, probationary employees are pointedly excluded. *Id.* § 7511(a)(1)(A). *See Hernandez v. Department of the Treasury,* No. 3–81, slip op. at 3 (Ct.Cl. Feb. 26, 1982); *Budnick v. MSPB,* 643 F.2d 278, 279 (5th Cir.1981). Probationary employees are denied even the more limited rights afforded tenured employees who suffer suspensions for 14 days or less. 5 U.S.C. § 7501 (1980).

This limitation on the rights of probationary employees was not an oversight; it was a conscious decision by Congress to afford federal managers great latitude in removing probationary employees before they become vested with the rights afforded tenured employees. *See* H.R.Rep. No. 1403, 95th Cong., 2d Sess. 21 (1978); *Borrell v. ICA,* 682 F.2d 981, 987–88 (D.C.Cir.1982). Indeed, Congress viewed the probationary period as "an extension of the examining

process to determine an employee's ability to actually perform the duties of the position." S.Rep. No. 969, *supra,* at 45, U.S. Code Cong. & Admin.News 1978, p. 2767. Thus, under the Act as elucidated by its legislative history, probationary employees appear to have rights no greater than those of applicants for federal employment; these rights cannot form a basis for suit in this court under 28 U.S.C. § 1491.

3. The third *Cort* test is whether it is consistent with the legislative purpose to infer a right of probationary employees to bring an action in this court. 422 U.S. at 78, 95 S.Ct. at 2087. It clearly appears not.

To hold that probationary employees may obtain direct judicial review of agency actions would stand the carefully drawn statutory scheme on its head and undermine one of the principal purposes of the CSRA—to enable federal managers to exclude unsuitable employees from the federal workforce. In establishing the Merit Systems Protection Board, Congress created a system whereby personnel actions which are to be reviewed outside the employing agency are first considered within the executive branch and reach the federal courts at the appellate level on the basis of the administrative record. 5 U.S.C. § 7503. These protections are afforded to tenured employees. It would be totally anomalous for Congress to have afforded probationary employees greater rights by entitling them to a judicial trial while affording tenured employees only a hearing before an MSPB presiding official.

To be sure, Congress did expect that, in deciding whether to terminate a probationary employee, agency managers exercise a good faith judgment. This does not, however, translate into a right to judicial review of that decision.[7] As with the great majority of decisions made by officers of the federal government, the principal guarantee of propriety and lawfulness lies in the acting official's good faith and honesty which are, of course, presumed.[8] *See INS v. Miranda,* —— U.S. ——, ——, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982) (per curiam); *Staskus v. United States,* 1 Cl.Ct. 633 at 636, 639 (Cl.Ct.1982) (LYDON, J.). *See generally, Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804 (1979) & cases cited therein. Doubtless, errors or abuses may still occur.[9] But the judicial review process can introduce abuses of its own. Exposing the personnel decision-making process to judicial scrutiny—and the panoply of procedures and delays associated therewith—undermines its integrity by increasing the likelihood that managers will refrain from terminating employees during probation even when they think it appropriate to do so.

This burden on managerial decision making would be far from insignificant. Tens of thousands of employees are given probationary appointments each year, and a significant number of them are terminated during the probationary period. *See generally* Office of Personnel Management, Personnel Agency Counts (PAC) Reports (FY 1981). The prospect of litigation in this court as to even a portion of those terminations could undermine the function of the

7. The Supreme Court in *Testan* specifically rejected the argument that jurisdiction must be inferred whenever a violation is alleged because a party might otherwise have a right without a remedy enforceable in this court. 424 U.S. at 401–02, 96 S.Ct. at 954–955. *See also United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982) (no right to judicial review of the amount of Medicare Part B benefits).

8. Indeed, the CSRA itself provides numerous procedures which quite clearly are relegated to an agency's unreviewable discretion. *See, e.g.,* 5 U.S.C. §§ 7501–03 (suspensions for 14 days or less); *id.* § 3592 (removals from the Senior

Executive Service). *See also Borrell v. ICA,* 682 F.2d at 988 (decision of Special Counsel of the Merit Systems Protection Board whether to bring corrective action is not judicially reviewable).

9. Judicial review does not, in any case, guarantee that all errors will be corrected. Even criminal proceedings, heavily weighted to resolve all doubts in favor of the accused, occasionally result in incorrect guilty verdicts. *See, e.g., Pardon Based on Innocence,* Washington Post, October 28, 1981, at A3, col. e. *See also* 28 U.S.C. § 1495 (authority of this court to entertain actions by individuals unjustly convicted and confined).

probationary period as an integral part of the examining process, when supervisors are meant to exercise broad discretion in determining the applicant's suitability for the position. *See* pp. 1257–1258 *supra*.[10]

The Act's drafters were acutely aware that the fear of protracted litigation can be a strong deterrent to federal managers wanting to impose needed discipline, and one of the major purposes of the CSRA was to eliminate or minimize this deterrent. *See, e.g.,* Ink Report, *supra,* at 5, 40, 52; S.Rep. No. 969, *supra,* at 9, 24, 40; President's Message to Congress, Mar. 2, 1978, *supra,* at 625–26; 124 Cong.Rec. S14312 (daily ed. Aug. 24, 1978) (statements of Senators Bellmon and Ribicoff); Hearings on H.R. 11280, *supra,* at 55–56 (statement of Hon. Joseph Califano, Secretary of HEW); Markup Meetings on H.R. 11280, *supra,* at 97 (statement of Rep. Udall).

Only Congress can determine the appropriate balance between the rights of employees and the prerogatives of managers. The federal courts in general, and this court in particular, *see* p. 1252 *supra,* must be exceedingly careful not to substitute their judgment by presuming that judicial review must have been intended. *See United States v. Testan,* 424 U.S. at 399–400, 96 S.Ct. at 953–954. Here Congress appears to have made a clear choice: it created no rights under the CSRA which could form the basis for an action by probationers under 28 U.S.C. § 1491. Moreover, one house of Congress expressly admonished that "[i]t is inappropriate to restrict an agency's authority to separate an employee who does not perform acceptably during [the proba-

tionary] period." S.Rep. No. 969, *supra,* at 45, U.S.Code Cong. & Admin.News 1978, p. 2767. This is a clear statement that an agency's discretion is not to be made subject to administrative or judicial review.

### D.

Plaintiff, however, points to a line of Court of Claims cases which holds that the court has authority to review probationary employee dismissals under either an "arbitrary and capricious" standard, *e.g., Greenway v. United States,* 163 Ct.Cl. 72 (1963), or to determine whether agency officials exercised an "honest judgment," *e.g., Perlongo v. United States,* 215 Ct.Cl. 982 (1977).[11] These cases were decided, however, before the effective date of the Civil Service Reform Act. As demonstrated, the Act constitutes a complete overhaul of the civil service system and of the rights of federal employees. Since the cited cases were decided under prior law, they constitute merely persuasive authority. *See Piskadlo v. Veterans' Administration,* 668 F.2d 82, 84 (1st Cir.1982) (DAVIS, J., by designation) (explicitly recognizing that the *Greenway-Perlongo* line of cases must be reappraised in light of the CSRA).

The Court of Claims decided these cases in the context of the pre-CSRA situation which was described as "an outdated patchwork of statutes and rules," S.Rep. No. 969, *supra,* at 3, U.S.Code Cong. & Admin.News 1978, p. 2725, and a "welter of inflexible strictures that have developed over the years [and] threaten to asphyxiate the merit principle itself." *Id.* While good reason may then have existed for inferring a con-

---

**10.** This case is illustrative. Even though still in its early stages, three depositions have been taken, covering over 230 pages of transcript. Plaintiff's immediate supervisor, Ms. Pervarnik, testified for 4 hours; Mr. Baker the postmaster, testified for 2 hours and 45 minutes over a period of two days. It is not unlikely that, remembering the delay, inconvenience and inherently intimidating atmosphere of these depositions, these supervisors may become more reluctant to dismiss probationary employees in the future.

**11.** Defendant suggests that these cases were wrongly decided and, apparently, invites the

court to overrule them. While the United States Claims Court is not of necessity bound by the precedents set by the United States Court of Claims, the judges of this court have determined that prudential considerations make it appropriate to give Court of Claims precedents full force and effect. General Order No. 1, U.S. Cl.Ct. Preceding Rule 1, 28 U.S.C.A. *See South Louisiana Grain Services, Inc. v. United States,* 1 Cl.Ct. 281 at 287, 1 USCCR No. 17 (1982) (LYDON, J.). Thus, this court is not authorized to overrule precedents of the Court of Claims.

gressional grant of jurisdiction to review dismissals of probationary employees, no such basis exists after Congress has carefully and comprehensively reviewed and catalogued employee rights in the CSRA.[12] In any case, the Court of Claims itself expressly left the issue open in *Montalvo v. United States,* No. 675–81C, *supra.*

### III.  *The Constitution*

#### A.

■ At oral argument, counsel for plaintiff asserted the first amendment as a basis for jurisdiction.[13] He suggested that plaintiff was fired in retaliation for complaints he had made about the absence of safety procedures. *See* p. 1252 *supra;* Complaint ¶ 34. Because neither party had addressed this question, the court requested supplemental briefs to assist it in resolving what appears to be a troublesome issue. Order of November 3, 1982.

The Court of Claims has generally taken a very restrictive view as to when a constitutional provision can form the basis for suit under the Tucker Act. The rule has been that to form the basis for jurisdiction, "the constitutional provision [must] in itself obligate the Federal Government to pay money damages." *Walton v. United States,* 213 Ct.Cl. 755, 757 (1977). Traditionally, the only constitutional provision construed as mandating compensation has been the taking clause of the fifth amendment, *Clark v. United States,* No. 658–80C, order at 8 (Ct.Cl. Nov. 6, 1981), the court having consistently rejected such other provisions as the due process and equal protection clauses. *See, e.g., Inupiat Community of the Arctic Slope v. United States,* 231 Ct.Cl. ——, ——, 680 F.2d 122, 132 (1982); *Walton v. United States,* 213 Ct.Cl. at 757 (1977); *Muehlen v. United States,* 209 Ct.Cl. 690 (1976).

The Court of Claims' treatment of the first amendment as a basis for jurisdiction has been less consistent. On the one hand, in *Featheringill v. United States,* 217 Ct.Cl. 24, 33 (1978), the court held that "the First Amendment . . . no more mandates the payment of money than does the due process clause and, thus, may not serve as a jurisdictional basis for plaintiff's law suit." *Accord Clark,* No. 658–80C, *supra.* On the other hand, in *Jackson v. United States,* 192 Ct.Cl. 765, 768, 428 F.2d 844 (1970), the court held that a probationary employee's claim that he was discharged in retaliation for the exercise of first amendment rights was " 'founded upon the constitution' of which we have jurisdiction by virtue of 29 U.S.C. 1491(1) . . . ." *Accord Bowman v. United States,* No. 577–79C, order at 2 (Ct.Cl. Mar. 6, 1981).

*Featheringill,* decided some eight years after *Jackson,* recognized the tension with that earlier decision and sought to distinguish it. The plaintiff in *Featheringill* had received a temporary appointment which expired, by its own terms, after one year. Plaintiff argued that the government's failure to reappoint him was motivated by retaliation for the exercise of his rights under the first amendment. 217 Ct.Cl. at 26–27. After rejecting plaintiff's argument that jurisdiction was based upon the Back Pay Act, 5 U.S.C. § 5596, 217 Ct.Cl. at 27–32, the court turned to the first amendment. It assumed, for purposes of the decision, that plaintiff had stated a valid claim of retaliation under the first amendment, a claim which could form the basis for relief if jurisdiction were established. The court nevertheless concluded that "even where a substantive right may exist, such a right does not of necessity mean that money damages are available [in the Court of Claims] to redress its possible violation." *Id.* at 32. As noted earlier, the court held

---

**12.** In the extensive legislative history of the CSRA there is no hint that Congress was aware of the handful of cases holding that Court of Claims review of probationary employee dismissals was appropriate. Therefore, it cannot be inferred that Congress acquiesced in the practice. *See Helvering v. Hallock,* 309 U.S. 106, 119–21, 60 S.Ct. 444, 451–452, 84 L.Ed.

604 (1940); *cf. United States v. Rutherford,* 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (1979).

**13.** Plaintiff also suggested that jurisdiction might be based on the fifth amendment but has since withdrawn that claim.

that the amendment could not form a basis for jurisdiction under the Tucker Act and therefore dismissed the action.

The *Featheringill* court distinguished *Jackson* in a single paragraph, noting that *Jackson* had involved a dismissal while the case before it involved a failure to reappoint. The court reasoned that in the non-reappointment situation the employee had no entitlement to the job whereas, presumably, the probationary employee in *Jackson* had some expectation of continued employment. The distinction now appears unpersuasive on at least two grounds.

First, an employee's expectations of continued employment under the civil service laws would seem to have no bearing on whether the first amendment is a money mandating provision which can form the basis for jurisdiction under the Tucker Act. Once it is concluded that the first amendment does not mandate the payment of money, it is difficult to see how that conclusion can be altered by any expectations the plaintiff may have arising from statutes or regulations governing the terms of his employment.

Second, the notion that probationary employees have rights greater than those of limited term employees has been seriously undermined by the Civil Service Reform Act. As discussed earlier, under the CSRA probationary employees were intended to have rights no greater than those of applicants for employment since the probationary period is considered to be merely an extension of the employment examination process. *See* pp. 1257–1258 *supra.* Thus, whatever basis may have existed for distinguishing *Jackson* at the time of *Featheringill*

has now been eroded by enactment of the CSRA.

Despite the apparently irreconcilable tension between *Featheringill* and *Jackson,* the Court of Claims treated both lines of cases as good law to the end. *Compare Clark v. United States,* No. 658–80C, *supra,* at 8, *and Mullins v. United States,* No. 240–81C, order at 3 (Ct.Cl. Oct. 30, 1981) (cases relying on *Featheringill* ); *with Cole v. United States,* 231 Ct.Cl. ——, ——, 689 F.2d 1040, 1041 (1982) *and Bowman v. United States,* No. 577–79C, *supra,* at 2 (cases relying on *Jackson*).

While it appears difficult to reconcile these two lines of cases, this court is without authority to choose between them. Under our General Order No. 1, *see* n. 11 *supra,* the court is bound to respect and follow precedents established by the Court of Claims "unless and until modified by decisions of the United States Court of Appeals for the Federal Circuit or the United States Supreme Court." *See also Federal Deposit Ins. Corp. v. Fagan,* 459 F.Supp. 933, 935 (D.S.C.1978); *Lakeside Community Hospital v. Tahoe Regional Planning Agency,* 461 F.Supp. 1150, 1153 (D.Nev.1978). While it may, of course, reexamine those decisions which have lost vitality because of changes in the statutes they were interpreting, *see* p. 1259 *supra,* the court is bound to respect *Featheringill's* decision to leave *Jackson* unimpaired, albeit confined to its facts. Because this case involves the dismissal of a probationary employee, as in *Jackson,* the court concludes that it has jurisdiction over that portion of plaintiff's claim which is based upon the first amendment.[14]

**14.** The position taken by defendant in its brief on the issue is somewhat unclear. In one portion of its brief, it appears to concede the court's jurisdiction, in general, to entertain first amendment claims of probationary employees, subject to certain prudential limitations. *See* Def.Supp.Mem. Concerning Juris. 10–12. In other portions of the same brief, defendant appears to argue that jurisdiction could not, after all, be based upon the first amendment, but that the first amendment could only be considered once jurisdiction had been otherwise established. *Id.* at 12–14.

In light of the somewhat contradictory state of the law, this lack of consistency is perhaps understandable. Nevertheless, even if one were to view defendant's argument as conceding jurisdiction, it would not be binding on the court since the parties may not, by argument or estoppel, confer upon the court jurisdiction not granted by Congress. *Indian Wells Valley Metal Trades Council v. United States,* 1 Cl.Ct. 43 at 46, 553 F.Supp. 397, 399, 2 USCCR No. 9 (Cl.Ct.1982) (WIESE, J.).

B.

While the court considers its conclusion inevitable under the law as left by the Court of Claims, it believes the issue to be ripe for consideration by the Court of Appeals for the Federal Circuit. As of October 1, 1982, that court has jurisdiction over all appeals from the Merit Systems Protection Board and will consider the lion's share of post-CSRA federal employment cases. The Federal Circuit thus has the authority, as well as the expertise and breadth of vision, to decide whether *Featheringill* and *Jackson* can continue to coexist after the passage of the CSRA, and, if not, which case shall survive. Guidance on this issue would be welcomed by this court.

Because the court is of the view that this issue of jurisdiction over plaintiff's first amendment claim involves a controlling question of law with respect to which there is substantial ground for difference of opinion, and that resolution of this question would materially advance the ultimate termination of the litigation, the court certifies the issue pursuant to 28 U.S.C. § 1292(d)(2), should defendant seek an interlocutory appeal under that section.

### CONCLUSION

The court grants defendant's motion in part, finding a lack of jurisdiction over plaintiff's claim insofar as it is based upon an Act of Congress or a regulation of an executive department. The court denies plaintiff's motion for summary judgment. The court concludes that it has jurisdiction over that portion of plaintiff's claim which is based upon allegations that the dismissal was taken in retaliation for the exercise of first amendment rights, but certifies this issue for possible interlocutory appeal.

Within 20 days, defendant shall file with the court an answer to those portions of plaintiff's complaint not rendered moot by this opinion or, in the alternative, a motion for stay of proceedings pursuant to 28 U.S.C. § 1292(d)(3) based upon counsel's representation that application for an interlocutory appeal has been filed in a timely fashion with the court of appeals.

IT IS SO ORDERED.