466

**STATE OF TEXAS**

v.

**The UNITED STATES.**

**No. 374–73.**

United States Court of Claims.

July 9, 1976.

Robert H. Koehler, Washington, D. C., atty. of record, for plaintiff. Patton, Boggs & Blow, Washington, D. C., John L. Hill and Elizabeth Levatino, Austin, Tex., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D. C., for defendant.

Before DURFEE, Senior Judge, and NICHOLS and BENNETT, Judges.

DURFEE, Senior Judge.

By motion for summary judgment the Government asks the court to grant it judgment dismissing plaintiff's petition asserting that- in refusing to grant plaintiff's requests for additional disaster relief funds under the Federal Disaster Act defendant breached its Disaster Assistance Agreement with plaintiff or alternatively acted arbitrarily and capriciously.

Responding by cross-motion for summary judgment nominal plaintiff, the State of Texas, seeks judgment on behalf of two of its counties on the above asserted claims of wrongful Government action in the amount of $656,245. Defendant's motion is granted and plaintiff's motion denied for the reasons set forth below.

On September 20, 1967 Hurricane Beulah struck the southeastern portion of the State of Texas devastating a twenty-nine-county area of the State including Cameron and Willacy Counties. In the aftermath of the disaster the Office of Emergency Planning (OEP) administratively located in the Executive Office of the President established field offices in the disaster area and Regional OEP officials, together with various other Federal authorities, met with State and local Government representatives to discuss Federal disaster relief assistance to the hurricane-stricken area. As a result of these meetings Federal officials advised the State and local authorities that the southeastern portion of Texas would probably be declared a major disaster area by the President pursuant to the Federal Disaster Act (42 U.S.C. §§ 1855–1855g)[1] which would thereby activate the disaster relief provisions of the Act. Federal officials further advised the State and local representatives that they could undertake necessary emergency work pending the Presidential disaster declaration by contracting with qualified private contractors.

On September 28, 1967 the President declared a 29-county area of Texas, including Cameron and Willacy Counties, a major disaster area pursuant to the Federal Disaster Act. On September 27, 1967 and October 9, 1967 Cameron and Willacy Counties respectively entered into contracts with a private contractor for debris removal and other related disaster relief work. These contracts were contingent upon the availability of Federal funds. On October 5, 1967 OEP and the State of Texas executed a Disaster Assistance Agreement. The initial agreement authorized OEP's expenditure of not more than 2.5 million dollars for use in furnishing disaster assistance. A November 1967 supplement to the agreement provided an additional 7.5 million dollars in disaster assistance funds. A June 1970 supplement to the agreement authorized the use of such additional funds as the OEP Director found necessary for Federal disaster assistance within the limits of funds available from Congressional appropriations for such purposes and authorized by the President. The record indicates that OEP has provided plaintiff with all of the ten million dollars authorized by the President for Federal assistance to the State and is devoid of any Presidential authorization to OEP to expend Federal disaster assistance funds in excess of that amount.

Following the execution of the Federal State Disaster Assistance Agreement both Cameron and Willacy Counties submitted project applications for Federal disaster relief financial assistance. The applications after State approval were submitted to OEP for approval. Project applications describe the estimated amount of necessary disaster relief work and the estimated cost thereof. Cameron County submitted its project application on November 13, 1967 requesting $1,461,040.62 in financial disaster assistance. Of this amount the State approved $621,786 and OEP concurred in the State's approved amount of Cameron County's project application. On December 6, 1967 both the State and OEP approved

---

1. In 1970 Congress repealed the Federal Disaster Act of 1950 [42 U.S.C. §§ 1855–1855g] and replaced it with an expanded Act now found at 42 U.S.C. § 4401, *et seq.* (1970).

Willacy County's submitted project application in the amount of $258,248. In both cases the amounts approved by the State and awarded by OEP were the amounts set forth in the Federal Damage Survey Reports on the hurricane damage to the two counties prepared by Federal inspection teams following Hurricane Beulah's devastation.

Subsequently both counties submitted supplemental project applications requesting additional disaster relief funds in excess of those approved on submission of their initial project applications. Cameron County requested an additional $840,252 and Willacy County sought an additional $443,695. After consideration of these supplemental applications the OEP Regional Director in June 1969 awarded Cameron and Willacy Counties additional disaster relief funds in the respective amounts of $32,574 and $14,191. With the award of these additional funds Cameron County received $730,553 of its requested amount of $1,538,231 and Willacy County received $429,504 out of a requested funding of $615,839.

Dissatisfied with the OEP Regional Director's partial disallowance of the funding requested in the two counties' project applications, the State of Texas appealed to the OEP National Director for full allowance of the sums requested by the counties, and approved by the State for disaster relief work. The State sought $807,678 on behalf of Cameron County and $186,335 on behalf of Willacy County. Incident to the State's two appeals OEP commissioned a private engineering report by Bovay Engineers, Inc. to assist and advise OEP in evaluation of the State's claims. The drafts of the Bovay report reached conclusions critical of OEP's accuracy in estimating the cost and amount of disaster relief work. OEP-suggested revisions of the draft Bovay reports, subsequently incorporated into the final report, diluted some of the report's criticism of OEP's underestimating of actual damage relief work in the two Texas counties.

Following receipt of the final Bovay report the OEP staff prepared its own report to the OEP Director reviewing the two counties' claims and concluding that the claims should be partially allowed. On July 7, 1970 the OEP Director notified the State that based on a review and re-evaluation of all information provided by the OEP staff and Bovay Engineers, Inc. that he had approved additional disaster relief funding in the amounts of $321,352 for Cameron County and $127,525 for Willacy County. The Director's decision raised OEP-approved disaster relief funding to $1,051,905 for Cameron County and $557,029 for Willacy County. Contending that there were apparent deficiencies in OEP computations of the sums approved for disaster work in the two counties, the State requested the OEP Director to approve the additional amounts requested by the two counties, i. e., $486,326 and $58,810 respectively. This the OEP Director declined to do and confirmed his July 7, 1970 decision as to the amounts approved for funding of disaster relief work in the two counties.

After an unsuccessful appeal to the Comptroller General this action followed with the State contending that OEP had either breached its Disaster Assistance Agreement with the State and/or acted arbitrarily and capriciously in denying the full amounts of OEP disaster relief funding requested by Cameron and Willacy Counties in their project applications.

■ At the outset both parties devote considerable argument as to whether their Disaster Assistance Agreement is, as plaintiff contends, a contract, or as defendant asserts, not "a binding contract in the traditional sense." In our view defendant's valid execution of a document, which it prepared and titled "Federal-State Disaster Assistance Agreement," specifying that "Federal assistance will be made available in accordance with [various specified laws, Executive Orders and regulations]" obligates defendant to provide such assistance as called for by the parties' Agreement.[2]

---

2. The Comptroller General has ruled that executed Disaster Assistance Agreements impose

enforceable obligations on both parties to the agreement. Comp.Gen. Decision B–167790

*See State of Arizona v. United States*, 494 F.2d 1285, 204 Ct.Cl. 171 (1974). After consideration of the various other arguments presented by the parties, the court views the question of whether defendant performed its obligations according to the parties' Agreement as the dispositive issue in this case. We hold that it has.

By the Federal Disaster Act Congress authorized Federal agencies to effectuate the intent of the Act [3] by providing disaster assistance as directed by the President.[4] In turn the President by Executive Order [5] authorized the Director of OEP to exercise the authority conferred on the President by the Act. This delegation of authority included the direction, upon the determination that a major disaster had occurred, to provide Federal assistance to the devastated State from funds allocated by the President to the OEP Director for disaster relief assistance in the devastated State.[6] The Federal assistance was to be provided from funds allocated by the President to the OEP Director to furnish such assistance to State and local Governments in a major disaster on the basis of an agreement jointly executed by the State's Governor and the OEP Director. As the basis for the provision of Federal Disaster Assistance to States such agreements were to contain State assurances that reasonable amounts of State and/or local Governments' funds would be expended to alleviate damage caused by the disaster and such other terms and conditions that the OEP Director would require consistent with the provisions of the Act. By promulgated regulations [7] and OEP Circulars supplied to States at the time of a major disaster, the OEP Director prescribed the terms and conditions under which Federal assistance would be made available to the State. Plaintiff raises no challenge that any of the regulations or OEP Circular rules promulgated by the OEP Director are invalid. Among the terms insisted upon by the OEP Director as a condition to Federal assistance was the provision that only such funds as the President authorized would be available for transfer under the Federal-State agreements.[8]

While plaintiff relies on several provisions of the parties' Agreement which it contends obligates defendant to reimburse plaintiff all of the costs regardless of amount it incurred to private contractors in performing disaster relief work, plaintiff seemingly ignores the provision of the parties' Agreement that:

> 5. The Director of the Office of Emergency Preparedness will allocate such amounts as he finds necessary for Federal disaster assistance for use in connection with this major disaster, within the limits of funds available from Congressional appropriations for such purposes

---

(January 15, 1973). See also 42 Comp.Gen. 289 (1962).

3. 42 U.S.C. § 1855 states the Congressional intent behind the Federal Disaster Act as follows:

"1855. *Declaration of Congressional Intent.*—It is the intent of Congress to provide an orderly and continuing means of assistance by the Federal Government to States and local governments in carrying out their responsibilities to alleviate suffering and damage resulting from major disasters, to repair essential public facilities in major disasters, and to foster the development of such State and local organizations and plans to cope with major disasters as may be necessary." [See 42 U.S.C. § 4401(b) (1970)].

4. 42 U.S.C. § 1855b provides:

"In any major disaster, Federal agencies are authorized when directed by the President to provide assistance * * * (d) by performing on public or private lands protective and other work essential for the preservation of life and property, clearing debris and wreckage, making emergency repairs to and temporary replacements of public facilities of States and local governments damaged or destroyed in such major disasters, * * * *and making contributions to States and local governments for purposes stated in this subdivision.* * *."* [Emphasis added].

5. Executive Order No. 10427, January 16, 1953, as amended by Executive Order No. 10737, October 29, 1957.

6. Executive Order No. 10737, October 29, 1957, as amended by Executive Order No. 10773, July 1, 1958.

7. 32 C.F.R. § 1710 (1967).

8. 32 C.F.R. § 1710.9 (1967).

*and authorized by the President.* [Emphasis added].

This provision of the parties' Agreement expressly limits the amount of Federal assistance which defendant will provide to plaintiff under the parties' Disaster Assistance Agreement to that amount authorized by the President regardless of the costs plaintiff incurs for disaster relief work. The provision makes no reference to plaintiff's costs but emphatically states that OEP's obligation under the parties' Agreement is to provide Federal disaster assistance within the limits of funds authorized by the President. OEP, having provided plaintiff with all of the funds authorized by the President for Federal assistance to the State, it has completely fulfilled its obligation to provide Federal assistance under the terms of the parties' Agreement, and plaintiff cannot recover additional disaster assistance funds from defendant by way of a breach of contract action. It has long been the rule that when an officer or agency of defendant does all it agreed to do, and all it was authorized to undertake, a plaintiff can ask no more of the Government. *Moline Water-Power Co. v. United States*, 20 Ct.Cl. 331 (1885).

Plaintiff's breach of contract claim rests on its misreading of the parties' Disaster Assistance Agreement and attendant OEP regulations. For its argument plaintiff relies on paragraphs 3 and 6 of the parties' Agreement which provide:

> 3. Federal assistance will be made available in accordance with Public Law 875, 81st Congress, as amended, Executive Orders 10427 and 10737, and the Regulations attached hereto.

> \*　　\*　　\*　　\*　　\*　　\*

> 6. Federal financial assistance will be made available in accordance with Exhibit A which is attached hereto and made a part hereof.

Of the OEP regulations referred to in paragraph 3 above, plaintiff relies on OEP Circulars 4000.4 and 4000.5A. Both Circulars contain nearly identical provisions concerning the categories of costs incurred by applicants, and eligible for Federal assistance.

Section VI, E of OEP Circular 4000.4 provides:

## E. CATEGORIES OF ELIGIBLE COST

Only certain costs incurred in disaster operations are eligible for reimbursement. The following paragraphs describe specific items which are clearly eligible or clearly ineligible. Project applications and vouchers　\*　\*　\* should be submitted accordingly　\*　\*　\*.

> \*　　\*　　\*　　\*　　\*　　\*

3. *Costs for Work Performed Under Contract*
　a. Eligible
　Costs for work performed by private contractors on eligible projects.

It is plaintiff's argument that since under the terms of the parties' Agreement OEP must provide financial assistance in accord with its regulations, including OEP Circulars, and that since those Circulars provide that plaintiff will be reimbursed for the cost of eligible work performed by private contractors that accordingly OEP must reimburse plaintiff for the costs of all such work performed and its failure to do so is a breach of the parties' Agreement.

■ The critical defect in this argument is that the OEP Circulars plaintiff relies on for its breach claim are neither incorporated by reference into the parties' Agreement as terms governing defendant provision of Federal assistance to plaintiff nor do they state an express obligation on defendant's part to reimburse plaintiff all of its eligible private contractor costs. The "Regulations" specified in paragraph 3 of the parties' Agreement as governing defendant's provision of Federal assistance and attached to the Agreement refer not to OEP Circulars but to agency regulations promulgated in the Federal Register[9] a copy of which did accompany the parties' Agreement. The OEP Circulars were neither promulgated by the agency as regulations,

---

**9.** 32 C.F.R. § 1710 (1967).

identified in the parties' Agreement nor even attached to the Agreement. In suing for a breach of contract plaintiff must rely on the express terms of the contract and cannot, as it has attempted to do here, import into the agreement terms outside of those expressly contained in the agreement. *New Jersey Foundry and Machine Co. v. United States,* 49 Ct.Cl. 235 (1914). As the OEP Circulars plaintiff relies on for its breach claim are not express parts of the parties' Agreement, plaintiff cannot sustain a breach claim by reliance upon them.

The OEP Circulars themselves do not obligate defendant to reimburse plaintiff all of its eligible private contractor costs. The Circulars are general issue manuals of the OEP entitled "Instructions to Applicants, Natural Disaster Program", and intended as noted in their "Forward" to provide instructions and guidance to State and local officials in applying for assistance under the Federal Disaster Act to supplement State and local expenditures in major disasters. Rather than being an express part of the parties' Agreement intended to obligate defendant to reimburse all of plaintiff's eligible private contractor costs, the Circulars are the documents referred to by the legend at the top of plaintiff's Project Application forms which reads: "Before completing this application, See Instructions." The "Conditions of Eligibility" section of the Circulars appertaining to the eligibility criteria relied on by plaintiff makes clear that under the Circulars defendant was not obligating itself to reimburse plaintiff for all of its costs meeting the eligibility criteria of the Circulars:

### B. CONDITIONS OF ELIGIBILITY
\* \* \* \* \* \*

4. Eligibility criteria listed in this chapter limit the amount of reimbursement *which may be made available* to the applicant for the cost of emergency work. \* \* \* [Emphasis added].

Even the provisions of the parties' Agreement upon which plaintiff relies to support its contention that under the parties' Agreement defendant is obligated to under-

write the entire amount of plaintiff's eligible costs expressly recognize that defendant's reimbursement obligation to plaintiff extends only up to the amount of funds authorized by the President rather than up to the total cost plaintiff incurs for such work. Paragraph 6 of the parties' Disaster Assistance Agreement, set forth above, refers to Exhibit A attached and incorporated as part of the parties' Agreement. Paragraph 1 of Exhibit A provides:

1. *General.* Federal financial assistance shall be provided *in accordance with the amounts set forth in paragraph 5 of the Agreement* and pursuant to Part 1710.9 of the regulations. [Emphasis added].

Paragraph 5 of the Agreement is the funding provision of the parties' Agreement specifying the amounts authorized for expenditure under the Agreement. Paragraph 5 of the parties' Agreement, as last amended, provided that Federal assistance to the State would be limited to the amount of funds "authorized by the President." As previously noted there is no evidence in the record that the President ever authorized OEP to expend more than the ten million dollars it provided in Federal disaster assistance to plaintiff.

■ Contrary to plaintiff's argument the provisions of the Circulars dealing with the reimbursability of eligible private contractor costs incurred by plaintiff are only, as their name implies, instructional and definitional in format and purpose, intended to describe those costs which defendant may reimburse plaintiff for, and do not state a binding obligation on the part of OEP to reimburse all such costs. They merely detail the rules governing plaintiff's application for, rather than defendant's provision of, Federal assistance under the Act. *Port Authority of the City of Saint Paul v. United States,* 432 F.2d 455, 457, 193 Ct.Cl. 108, 113 (1970).

Like plaintiff's breach argument its contention that defendant's refusal to reimburse two of plaintiff's counties the full cost of their private contractor's billings

was arbitrary and capricious action must fail. Even if the court were to accept plaintiff's factual assertions as to the inaccuracy of defendant's damage estimates in the two counties and that OEP deliberately revised the Bovay Report on the merits of plaintiff's claims for the sole purpose of diverting criticism from the agency, the uncontested facts still remain that all the Federal Disaster Act called for; all the parties' Agreement provided for; and all the OEP obligated itself to plaintiff to do was provide Federal Assistance up to the monetary limits authorized by the President. Defendant having done this its actions in refusing to provide additional assistance beyond the financial limits authorized by the President, who under the Act and the parties' Agreement had sole authority to determine the amount of Federal assistance available to States "in carrying out their responsibilities to alleviate suffering and damage resulting from major disasters" cannot be adjudicated as arbitrary and capricious as to entitle plaintiff to judgment.

Judicial enforcement of consensual and statutory limitations on the extent of defendant's fiscal liability in an undertaking is by far the customary rather than the extraordinary in the field of Federal contracting. *Spearin v. United States,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Sutton v. United States,* 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1921); *Lockheed Aircraft Corp. v. United States,* 426 F.2d 322, 192 Ct.Cl. 36 (1970). In defendant's provision of Federal assistance such enforcement becomes all the more necessary because of the view we accepted in *Port Authority of the City of Saint Paul, supra,* 432 F.2d at 460, 193 Ct.Cl. 117, that in a major disaster OEP could anticipate requests for assistance in excess of available funds. Correspondingly, the President must anticipate major disasters across the country generating requests for assistance in excess of his disaster relief appropriation from Congress. In *Port Authority of the City of Saint Paul,* we approved OEP's ac-

tions in limiting Federal assistance to public facilities other than those leased to private interests as a reasonable measure to conserve OEP's limited resources. Likewise in the instant case we uphold OEP's actions in limiting Federal assistance to the amount of funds authorized by the President as a reasonable measure to assure that funds will be available to render Federal assistance in other major disasters.

Such enforcement of limiting provisions in Federal-State Disaster Assistance Agreements is also necessary to further the express intent of Congress under the Act. Congress enacted the Federal Disaster Assistance Act with the full knowledge that funding would never be sufficient to provide complete relief in times of major disaster [10] but with the noble purpose of providing "an orderly and continuing means of *assistance* by the Federal Government to States and local governments in carrying out *their responsibilities* to alleviate suffering and damage resulting from major disasters." During Congressional consideration of the Act one of the sponsors of the bill which eventually became the Federal Disaster Act succinctly set out the eleemosynary but understandably limited Congressional purpose behind providing Federal assistance to the States in times of major disasters, and completely refuted plaintiff's argument that the Government must pay *all* of plaintiff's eligible costs:

> Mr. McClellan. Mr. President, I do not think anyone should gain the erroneous impression that it is the purpose that this bill shall apply to all losses occurring in the United States, so that everyone who sustained a loss might be compensated by the Government. If anyone is laboring under that impression, it certainly is not the intent of the Congress and it is not the intent of the sponsors of the bill. The purpose of the bill is to meet emergency needs, and to meet a situation which the local people cannot meet except at the cost of great suffering and hardship. It is not to make whole everyone who may lose property or may sus-

---

**10.** 96 Cong.Rec. 11895–11915 (1950).

tain damage. If we were going to do that, of course, the Government would get into everything. * * *. [11]

In summary, on the record before us, the court finds that following the devastation of Texas in 1967 by Hurricane Beulah the President authorized ten million dollars in Federal assistance to the State. OEP expended the authorized funds and fulfilled its obligations to provide "assistance" to Texas in response to the disaster which it encountered. This Presidential action and the corresponding action of the OEP of fully providing the authorized amounts of Federal assistance to plaintiff fully and reasonably complies with the requirements of the Federal Disaster Act and the parties' Disaster Assistance Agreement. Accordingly plaintiff, after already having received ten million dollars in Federal assistance, cannot prevail on its claims seeking an additional $600,000 from defendant.

Granted is defendant's motion for summary judgment. Denied is plaintiff's cross-motion, and its petition is dismissed.

NICHOLS, Judge (concurring):

I join in the court's decision and in its opinion, which I deem clearly right, except to the extent stated. However, I note that defendant made a strong argument that the authorization in 42 U.S.C. § 1855b, as it then was, to make "contributions" to "States and local governments" did not include authority to make binding contracts, but only gratuitous contributions, which might be withheld at pleasure. As to this it relied on the closing sentence of the section:

 * * * The Federal Government shall not be liable for any claim based upon * * * a discretionary function or duty on the part of a Federal agency or an employee of the Government in carrying out the provisions of this section.

Though this language is cryptic in a contract authorization context, defendant argued from legislative history, not unpersuasively, that it was meant to safeguard the United States from being sued by any state

that did not think its allocation of Federal disaster relief sufficient.

The court, to refute this, cites *State of Arizona v. United States,* 494 F.2d 1285, 204 Ct.Cl. 171 (1974). However the conclusion there reached, that the United States was contractually liable to pay Arizona its agreed share of Federal Aid for Highway funds, was not difficult to arrive at in light of 23 U.C.A. § 106(a), which declares that the Secretary's approval of a State highway project:

 * * * shall be deemed a contractual obligation of the Federal Government for the payment of its proportional contribution thereto. * * *

There is no such provision to aid us here. The Supreme Court in *United States v. Testan* (Decided March 2, 1976), 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114, 44 U.S. L.W. 4245, has recently demanded, or seemed to demand, that we look for statutory language of just this kind before holding the Government liable in any Tucker Act (28 U.S.C. § 1491), litigation. If not express, it should at least be clearly implied. I fail to find it in the Disaster Relief legislation.

This difficulty could obtain at the outset and perhaps could be met upon the making of a formal contract, as here, to the extent of the contract terms. Since Texas loses anyway, it is perhaps unnecessary to go into the impact of the *Testan* doctrine now. It will probably be a long time before we all easily agree as to just what otherwise valid claim is barred because of *Testan.* Defendant's position leaves much uncertainty as to how it would have implemented the statute, since it presumably would not wish to put itself in the position of having made contracts that could not be authoritatively construed by a court if any dispute arose. Similar problems may arise under the current provision for Disaster Relief in 42 U.S.C. § 5121 and ff. This is much more elaborately worked out, but the provisions giving me trouble seem to recur.

Instead of holding flatly that the *Federal-State Disaster Assistance Agreement*

---

**11.** 96 Cong.Rec. 15097 (1950).

**474**

here involved was just as much a contract as the one in the *Arizona* case, I would have assumed *arguendo* that this was so, and gone on to demonstrate, as the court persuasively does, that the supposed contract does not provide basis for the claim Texas makes in this case.