NORTHERN INDIAN HOUSING AND DEVELOPMENT COUNCIL, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 203–84C.

United States Claims Court.

May 28, 1987.

Terry L. Pechota, Rapid City, S.D., for plaintiffs.

Frank B. Flink, Jr., Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Mark K. Ulmer, U.S. Dept. of Housing and Urban Development, of counsel.

## OPINION

### MOODY R. TIDWELL, III, Judge:

This contract case is before the court on cross-motions for summary judgment. Plaintiffs are the Northern Indian Housing and Development Council and 13 Indian Housing Authorities who allege that the government wrongfully offset insurance premium payments that were advanced to them. Defendant argues that plaintiffs' Complaint should be dismissed for lack of jurisdiction because the Department of Housing and Urban Development did not violate any constitutional, statutory, or regulatory provisions in offsetting the advanced insurance premiums. In addition, defendant argues that the doctrine of estoppel and waiver do not preclude the government from recovering the advanced premiums.

## FACTS

The Indian Housing Authorities (IHAs) are part of local tribal governments that were created under the auspices of the Department of Housing and Urban Development (HUD) to administer low-income housing programs for members of their respective tribes on reservations. HUD subsidizes the IHAs pursuant to the Housing Act of 1937, as amended, 42 U.S.C. § 1437g, regulations formally published at 24 C.F.R. Part 905; and by contract between HUD and each IHA called an Annual Contributions Contract (ACC). This suit is limited to half of the IHAs under the umbrella of HUD Region VIII—a region that covers IHAs in seven western and mid-western states.

There is no contention that each housing unit must be insured. In fact, each IHA is contractually obligated to the government to provide insurance for all housing units it administers. The responsibility for creating an escrow account to cover the insurance premium is that of each IHA. It became known to HUD's Assistant Secretary for Housing-Federal Housing Commissioner that many, if not most, IHAs had failed to collect or escrow funds to pay the insurance premiums for the three-year policy period 1977 to 1980. Accordingly, HUD issued Policy Notice H–77–108 to all HUD field offices and IHAs authorizing the field offices to advance the insurance premiums to those IHAs that did not have sufficient funds to pay the premium. Region VIII advanced funds to all IHAs in its district regardless of their financial status because it did not have time to analyze each financial account of the IHAs before the premium became due. The Policy Notice stated that the subsidy advance was to be repaid to HUD pursuant to a payment plan scheduled so as not to place any IHA in "undue financial difficulty." The Policy Notice also stated that the advance was to be used solely to pay the insurance premium, the IHAs were to immediately establish an escrow account to accumulate funds for the next insurance premium due on November 2, 1980, and if any IHA failed to repay the advance the amount outstanding would be offset against future operating subsidies.

HUD Region VIII advanced the insurance premiums to the IHAs it administered and sent each a modified budget, which contained language that "[t]his amount shall be recovered by HUD." There is vague reference in the record to the effect that one IHA member "remembers" being told in November, 1977 at an IHA conference, by a second level Region VIII employee, that the insurance premium subsidy advances would not have to be repaid. Other IHA representatives do not remember such a statement. On other occasions, less senior Region VIII employees told a few IHA representatives "not to worry about the insurance premium advance because it would not have to be repaid." Plaintiff claims that until August 28, 1981, the IHAs understood that the advance would not have to be repaid. However, on that date Region VIII formally advised the IHAs that the advances would have to be repaid or the amount owed would be offset against operating subsidies. On August 3, 1981, the Assistant Secretary for Housing-Federal Housing Commissioner wrote the Acting Regional Director of Region VIII telling him, among other things that "[i]n view of the serious financial condition of many IHAs, you may, if necessary, establish repayment schedules for the amounts due in order to minimize any adverse impact on current IHA operations." Some IHAs repaid the subsidy advance under protest; others refused and Region VIII offset the 1977 premium advance against the latter group by withholding operating subsidies. Despite the varying degrees of financial difficulty the IHAs were experiencing, funds were available for offset due to a last minute budget amendment. To explain, at the outset of fiscal year 1981 HUD reduced the operating subsidy levels for all IHAs to 85.5 percent of the amount previously advanced.[1] Expenditures were correspondingly reduced by the IHAs to reflect the lower level of federal assistance. But, at the close of fiscal year 1981, HUD increased the subsidy levels to 95.5 percent of previous subsidies. Region VIII used the unexpected windfall subsidy increase to offset virtually all of the premium advances. Plaintiffs claim that Region VIII

has or eventually will offset funds totaling $511,875.

## DISCUSSION

Defendant argued that this court lacks jurisdiction over this litigation because plaintiffs have not and cannot demonstrate that HUD violated some statute or regulation that can fairly be read to entitle plaintiffs to compensation or to the return of money improperly exacted. *E.g., Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967). *Eastport*, its predecessors and progeny are referred to as cases in which " 'the Government has the citizen's money in its pocket' and the claim is 'to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute.' " *Eastport*, 178 Ct.Cl. at 606, 372 F.2d 1002 (quoting *Clapp v. United States*, 127 Ct.Cl. 505, 512–13, 117 F.Supp. 576, 580 (1954)); *see also Pan American World Airways, Inc. v. United States*, 129 Ct.Cl. 53, 55, 122 F.Supp. 682, 683 (1954).

Another category of cases relied on by plaintiffs includes those where a specific provision of law commands the government to pay money to plaintiff upon proof of conditions that plaintiff is alleged to have met. In this type of case, we have held that "a claimant who says that he is entitled to money from the United States because a statute or a regulation [or the Constitution] grants him that right, in terms or by implication, can properly come to the Court of Claims, at least if his claim is not frivolous but arguable." *Ralston Steel Corp. v. United States*, 169 Ct.Cl. 119, 125, 340 F.2d 663, 667 (1965), *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965).

Under 28 U.S.C. § 1491(a), the jurisdictional question that must always be asked is whether a constitutional clause, separate legislation, a contract or a regulation of an executive agency can fairly be interpreted as mandating compensation by the government for an injury sustained. If not, this court cannot grant relief. In determining whether a particular claim of

jurisdiction properly references a money-mandating document or provision of law, the court must begin with the premise that it is a court of limited jurisdiction. All claims brought into the court involve the United States and thus involve waiver of sovereign immunity. *Porter v. United States*, 204 Ct.Cl. 355, 359, 496 F.2d 583, 586 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *National State Bank of Newark v. United States*, 174 Ct.Cl. 872, 876, 357 F.2d 704, 706 (1966). The court must exercise not only the traditional reluctance of federal courts to act absent specific statutory authorization, *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 93, 2 L.Ed. 554 (1807), but an additional measure of restraint growing from the principle that waivers of sovereign immunity must be narrowly construed. *See United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); *United States v. Sherwood*, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941); *Kabua v. United States*, 212 Ct.Cl. 160, 167, 546 F.2d 381, 385 (1976), *cert. denied*, 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977).

█ The validity of plaintiffs' jurisdictional claim is contingent upon a finding that Policy Notice H–77–108 is a regulation of an executive department that mandates compensation by the United States for the improper offset of funds properly owed to plaintiffs. The test as to whether a particular publication may be considered a regulation depends upon whether the executive department that promulgated the document intended that the regulation be binding upon it. *Fairington Apartments of Lafayette v. United States*, 7 Cl.Ct. 647, 650 (1985). It is well established that a department or agency is bound by the regulations it promulgates. *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Cruz-Casado v. United States*, 213 Ct.Cl. 498, 502–03, 553 F.2d 672, 675 (1977); *Connolly v. United States*, 1 Cl.Ct. 312, 315, 554 F.Supp. 1250, 1253 (1982), *aff'd in part and rev'd in part*, 716 F.2d 882 (Fed.Cir. 1983), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984); *G.L. Chris-*

*tian and Associates v. United States*, 160 Ct.Cl. 58, 65, 320 F.2d 345, 350, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

█ Factors to be considered by the court in determining if the Policy Notice is a regulation include: HUD regulations providing that all HUD regulations be published in the Federal Register, 24 C.F.R. § 10, *et seq.*, *Ranjel v. City of Lansing*, 417 F.2d 321, 323 (6th Cir.1969), *cert. denied*, 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390 (1970) *reh'g denied*, 397 U.S. 1059, 90 S.Ct. 1352, 25 L.Ed.2d 680 (1970); whether a handbook was intended for internal use only, *Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 360–61 (5th Cir.1977), *reh'g denied*, 559 F.2d 1217 (1977), and whether a handbook was meant to be an independent source of authority for formal HUD actions, *Feldman v. United States Department of Housing and Urban Development*, 430 F.Supp. 1324 (E.D.Pa.1977). Neither party addressed these three factors in their jurisdictional argument but did provide enough information to permit the court to apply them to Policy Notice H–77–108. HUD policy requires formal rulemaking for all "programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. § 10.1 (1986). HUD defines "Rule" or "Regulation" as "all or part of any Departmental statement of general or particular applicability and future effect designed to: (1) Implement, interpret, or prescribe law or policy...." 24 C.F.R. § 10.2 (1986). Thus, by its own rule, any policy statement by HUD affecting a loan, benefit or contract would be expected to be a regulation, the terms of which would be binding upon the United States. The ultimate test, however, is HUD's intention at the time the document was executed, even though many documents appear to fall within HUD's definition of a regulation. *Dunphy v. United States*, 208 Ct.Cl. 986, 989, 529 F.2d 532 (1975); *McGrath v. United States*, 1 Cl.Ct.

236, *aff'd mem.*, 714 F.2d 161 (Fed.Cir. 1983).

■ It is the opinion of the court that HUD did not intend the policy notice to be a regulation having the force and effect of law that would be binding upon it. *Cf. G.M.O. Niehaus & Co. v. United States,* 139 Ct.Cl. 605, 153 F.Supp. 428 (1957) (holding that the intention of the President was the controlling factor on what would be binding); *Kephart v. United States,* 109 Ct.Cl. 646, 74 F.Supp. 578 (1947) (the intention of Congress governed the interpretation of the statute), *motion overruled,* 109 Ct.Cl. 654, 75 F.Supp. 1020 (1948). The court in *Rousseau v. Philadelphia,* 589 F.Supp. 961 (E.D.Pa.1984), recognized that HUD had expressed a policy of promulgating all of its rules and regulations under the procedures of the Administrative Procedures Act, 5 U.S.C. § 553, but in that case HUD had chosen not to publish a certain handbook in the Federal Register and thus indicated its intent that the handbook did not carry the force of a published rule or regulation. *Rousseau* at 971–73. It was not a regulation that would be binding upon HUD. In the case at bar, Policy Notice H–77–108 was not published in the Federal Register, thereby similarly manifesting HUD's intention that it was not a rule or regulation having the force and effect of law that would be binding upon HUD. Further indication that HUD never intended for the Policy Notice to be a regulation is found in the fact that it was promulgated on November 2, 1977 and expired, by its own terms, six months later on May 2, 1978.

Plaintiffs cite several decisions for the proposition that this court has jurisdiction in the case at bar. For example, *Portsmouth Redevelopment & Housing Auth. v. Pierce,* 706 F.2d 471 (4th Cir.1983), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336, indicated that this court had exclusive jurisdiction to adjudicate a contract claim brought under the ACC between HUD and a housing authority based upon the housing authority's refusal to amend its ACC to bring it into accord with an amendment to 42 U.S.C. § 1437g and

HUD's withholding of operating subsidies. This case and others cited by plaintiff are inapplicable to the case at bar because they were brought under an express contract, *i.e.,* the Annual Contributions Contract. 28 U.S.C. § 1491(a)(1) (1982). The alleged underlying jurisdictional document in this case is the Policy Statement, not an ACC. Even though plaintiffs each have a similar, if not identical, ACC as did the plaintiff in *Portsmouth,* the present claim was not, and could not be brought under the contract because the Policy Notice did not reference, amend or in any other manner become a part of the ACC.

■ The Policy Statement was also not a contract implied in fact. A contract implied in fact is based on conduct, but also requires a showing of the same contractual elements as those required to establish an express contract. *Nitol v. United States,* 7 Cl.Ct. 405, 415 (1985). There must not only be an offer, acceptance and consideration, but also mutual intent to contract. *Omega World Travel v. United States,* 9 Cl.Ct. 623, 627 (1986). Moreover, to vary a contract, any post-closing agreement based on oral representations must be supported by consideration. *Montefiore Hosp. Ass'n. v. United States,* 5 Cl.Ct. 471, 476 (1984). All of these elements are lacking here. In fact, had plaintiffs attempted to ground their suit on the ACC, they would have been confronted with § 304(H) of the contract, which provides, in pertinent part that:

> If the local authority [an IHA] shall fail at any time to obtain and maintain insurance ... the [Government] may obtain such insurance on behalf of the Local Authority and the Local Authority shall promptly reimburse the [Government] for the cost thereof....

Plaintiffs also argued that *Missouri Health & Medical Organization, Inc. v. United States,* 226 Ct.Cl. 274, 641 F.2d 870 (1981), granted the court jurisdiction in the case at bar because the action arose out of an obligation created by a government program. In *Missouri Health,* the government had awarded a grant to plaintiff to subsidize its program to provide medical

services to the "medically indigent." The court concluded that:

> Defendant is mistaken in its position that an obligation which is enforceable in [the Court of Claims] can only be evidenced by a contract duly executed by the parties. An instrument, other than the traditional formal contract, can create obligations which are cognizable in this court.

*Id.* at 278, 641 F.2d at 873.

As support for its conclusion, that court cited *Texas v. United States,* 210 Ct.Cl. 522, 537 F.2d 466 (1976). *Texas,* like *Missouri Health,* involved a federal-state agreement, executed by the parties, obligating the United States to provide funds to the respective plaintiffs. The court in *Texas* held that the "Federal-State Disaster Assistance Agreement" was a contract. *Texas,* 210 Ct.Cl. at 536, 537 F.2d at 473–74 (Nichols, J., concurring). This court agrees and, of course, recognizes that obligations enforceable in the court may be created out of documents other than a procurement contract, *i.e.,* an express or implied contract, or any other document denoting joint contractual obligations such as the ACC. The Policy Notice, however, as previously discussed, cannot be construed to be a contract, express or implied, either by its caption or its content, and thus does not confer jurisdiction upon this court.

*Portsmouth Redevelopment* and *Missouri Health* should be read in concert with *Tree Farm Development Corp. v. United States,* 218 Ct.Cl. 308, 585 F.2d 493 (1978), which was also cited by plaintiff. In *Tree Farm,* plaintiff's loan application for subsidized housing was denied by HUD. The Court of Claims found it had no jurisdiction to consider plaintiff's claim. Plaintiff brought suit on the basis of a breach of a contract implied-in-fact. The Court of Claims considered the claim in the context of a procurement award and, in so doing, pointed out that it is an "implied

condition of the request for offers that each of them would be honestly considered, and that that offer which in the honest opinion of the contracting officer was most advantageous to the Government would be accepted...." *Heyer Products Co. v. United States,* 135 Ct.Cl. 63, 69, 140 F.Supp. 409, 412 (1956). Plaintiffs in *Tree Farm* and the case at bar do not fall within the parameter of the *Heyer* principles because they were not disappointed bidders; they were subsidy recipients.

Plaintiffs also cite *Pasadena Hospital Ass'n v. United States,* 223 Ct.Cl. 72, 618 F.2d 728 (1980), apparently in support of their argument that the court has jurisdiction to hear their case based upon a breach of regulations having the force and effect of law. The crucial distinction between *Pasadena* and this case is that the suit in *Pasadena* was brought under valid regulations, promulgated by the then Department of Health, Education and Welfare, published in the Federal Register, 37 Fed.Reg. 10,725 (1972), and published subsequently in the Code of Federal Regulations at 20 C.F.R. § 405.499g (1973) (now replaced by 42 C.F.R. § 405.1885 (1979)). Those regulations addressed payment and reimbursement procedures of a medicare provider. In the case at bar, as stated heretofore, the Policy Notice does not rise to the dignity of an official HUD regulation that might, depending upon how it was drafted and promulgated, provide the court with requisite authority. It is clear from a review of applicable law, other documents, and the pleadings of the parties that the court is without jurisdiction to adjudicate this case.

Assuming, *arguendo,* that the Policy Statement was a regulation granting jurisdiction to the court, the outcome would be the same because defendant cannot be prohibited by estoppel and waiver from offsetting any subsidy funds otherwise owed to the IHAs to recoup the 1977 insurance premiums.[1] Plaintiffs would have the

---

1. Defendant, in its cross-motion for summary judgment and opposition to plaintiffs' motion for summary judgment, states in several instances that even if this court asserts jurisdiction, disputes of fact exist, implying the need for trial. The court disagrees. It has carefully

studied the briefs and is of the opinion that while issues of fact are present they are not material to the dispositive issues and that sufficient information was provided by the parties to permit the court to rule on the cross-motions for summary judgment.

court estop defendant, *nunc pro tunc*, from offsetting any of the advanced insurance premium subsidies to the Region VIII IHAs because, by doing so, it violated the provision of the Policy Notice by placing the IHAs in "undue financial difficulty."[2] Plaintiffs argued that there is absolutely nothing in Policy Notice H–77–108 that required the advanced insurance premiums to be recaptured by the United States. To substantiate such an argument, the court must accept plaintiffs' basic premise that any attempt to recover the advances would automatically place plaintiffs into undue financial difficulties. That was not the case. HUD was aware of the financial difficulty issue and appropriately addressed it by directing its field officers to "schedule collection" of the funds to avoid placing any IHA in any financial difficulty.

■ Plaintiffs do not characterize the estoppel sought as promissory or equitable, but it is clear from the language of their motion for summary judgment that they seek the latter.[3] Plaintiffs properly state the four elements which are necessary for promissory estoppel: (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that its conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other parties'

conduct to its injury. *E.g., First National Bank v. United States,* 6 Cl.Ct. 241, 244 (1984); *Russell Corp. v. United States,* 210 Ct.Cl. 596, 612–13, 537 F.2d 474, 484 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). In addition, to estop the United States, the conduct or representation relied upon must be made by government officers acting within the scope of their authority. *City of Alexandria v. United States,* 737 F.2d 1022, 1027 (Fed. Cir.1984) and cases cited therein.

■ With respect to the first two elements, the court has no difficulty in concluding that the Assistant Secretary knew the facts when he caused the Policy Notice to be executed, otherwise he would not have included the caveat that no recovery should be scheduled that would place any IHA in any undue financial difficulty. The court finds that HUD intended to recapture the advanced funds but with the caveat in mind. The alternate finding of the second element is not so clear. The court is of the opinion that the Region VIII employees who assured some IHA representatives that they would not have to repay the advanced funds acted outside the scope of their authority. Such insubordinate statements cannot be held to bind the United States. The lack of authority of Region VIII employees to amend or negate the terms of the Policy Notice dooms any estoppel argument that HUD had no present authority to recoup the advanced premium

2. Plaintiffs charge that the belated offsets were precipitated wholly, if not in significant part, by the change in administration from President Carter to President Reagan and the latter's new fiscal policies, which involved an intense effort to collect debts owed the United States. Plaintiffs place great reliance upon the language of the Policy Statement that limited repayment so as to not place any IHA in "undue financial difficulty." Admittedly, the Policy Statement clearly provided for the recovery of the advanced insurance premium subsidy and also stated that the subsidies were to be recovered before the premiums became due again on November 2, 1980. Plaintiffs charge, however, that the stated intent of HUD to recover the insurance advances was, in so many words, a mere facade. HUD had knowledge, according to plaintiffs, that the IHAs were in "financial difficulty" in 1977 and 1981. When Region VIII offset operating funds from the fiscal year 1981 IHA operating subsi-

dies, it allegedly violated its own Policy Notice because the IHAs were already in undue financial difficulty. In reducing the operating expenses even further to recapture the 1977 advanced insurance premiums, plaintiffs claim they were driven into deeper financial difficulty. Plaintiffs pray that those funds recaptured by HUD, as a consequence, must be repaid to the IHAs in Region VIII.

3. The importance of promissory versus equitable estoppel is that promissory estoppel does not grant jurisdiction because the United States has not waived its sovereign immunity with regard to a promissory estoppel cause of action. *Biagioli v. United States,* 2 Cl.Ct. 304, 308 (1983); *see also Connolly v. United States,* 1 Cl.Ct. 312, 554 F.Supp. 1250 (1982), *aff'd in part and rev'd in part,* 716 F.2d 882 (9th Cir.1983), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

funds. *Alexandria*, 737 F.2d at 1027. Those who deal with government officials do so at their peril. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Moloney & Rubien Constr. Co. v. United States*, 214 Ct.Cl. 809, 810, 566 F.2d 1189 (1977). The IHAs also had no basis upon which to predicate a legitimate belief that the Policy Notice executed by the Assistant Secretary could be abrogated by Region VIII employees of HUD. The Policy Notice was not issued to give each IHA the option of whether or not to reimburse HUD for the insurance premium advances, rather to provide methods to HUD and the IHAs to reimburse HUD.

■ As to the third element, the court finds it very difficult to believe that plaintiffs were ignorant of the true facts. They knew that the Policy Notice called for repayment of the funds and had heard only oral statements from local officers of HUD that they should "not worry" about the requirement. At most they could only have known of bureaucratic confusion. The court must conclude that Region VIII officials acted properly under the Policy Notice by scheduling recovery of the funds so as not to put the IHAs into any undue financial difficulty. The court finds no reason to depart from the long-established principle that this court will not set aside an administrative decision unless it is arbitrary, capricious or clearly amounts to an abuse of discretion. *Missouri Health and Medical Organization, Inc. v. United States*, 226 Ct.Cl. 274, 280, 641 F.2d 870, 874 (1981). It was probably nothing more than happenstance or luck that the operating budgets were increased at the close of fiscal year 1981, but that increase, which could not have previously been budgeted to any account or program, enabled Region VIII to recover the advanced funds within the parameters of the Policy Notice. It may well be that Region VIII officers had been totally unable to schedule the recovery of the funds prior to that point in time, but the unbudgeted windfall permitted them to finally "schedule" recovery in accordance with the caveat.

Finally, the court cannot find that plaintiffs relied on Region VIII's conduct and statements to their injury. The Policy Notice was clear in its requirements and Region VIII employees were not authorized to change the terms of the Policy Notice, nor were plaintiffs entitled to rely upon any contrary indications, conduct or statements of Region VIII employees. *See Federal Crop. Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Nor can it be found that plaintiffs suffered any "injury." Even though a few representatives of the IHAs may have heard Region VIII employees say not to worry about repayment and even though Region VIII failed to create insurance premium escrow accounts in post–1977 IHA budgets, the funds recouped by offset came from the 1981 fiscal year-end windfall. The court recognizes that the IHAs, without doubt, could have found other ways to use the windfall funds, but that is irrelevant to the issue. The court also may properly assume that the Region VIII employee(s) who executed the offsets acted properly, *Missouri Health*, 226 Ct.Cl. at 280, 641 F.2d at 874, by determining that the windfall gave HUD an opportunity to properly schedule recoupment of the advanced premium funds without putting any IHA into undue financial difficulty.

The four elements of equitable estoppel are in the conjunctive, *i.e.,* all must be met. The record, at the least, shows clearly that plaintiffs could not have relied in good faith on the statements of Region VIII employees to their injury. The facts of the case and argument of counsel leave the court with no alternative but to deny plaintiffs' request that defendant be estopped from recouping the advanced premium subsidies and, for that matter, returning funds already offset.

■ Plaintiffs also argued that HUD expressly waived its right to recoup the advanced premiums by failing to collect the subsidies by November 2, 1980 as implied in the Policy Notice, and then by waiting four years to offset those funds. Waiver is an equitable doctrine, *Canada Dry Corp. v. Nehi Beverage Co.*, 723 F.2d

512, 518 (7th Cir.1983); *Molton, Allen & Williams, Inc. v. Harris*, 613 F.2d 1176, 1180–81 (D.C.Cir.1980), involving the voluntary and intentional relinquishment of a known right. *Midwest Petroleum v. American Petrofina, Inc.*, 603 F.Supp. 1099 (E.D.Mo.1985). Plaintiff does not claim that the Policy Notice or any statute or regulation put a time limit on recoupment of the funds other than language in the Policy Notice, which states that the IHAs should create an escrow account to repay the 1977 advance and the next premium before the next premium became due on November 2, 1980. The Policy Notice does not specifically mandate reimbursement of the 1977 advance on or before November 2, 1980. The court finds that reimbursement could have properly been made in 1978, 1980, 1981, or for that matter, ten years hence. The overriding requirement vis-a-vis recoupment was the caveat not to schedule recovery so as to place any IHA in undue financial difficulty. According to defendant, the first opportunity to recover the funds came in late 1981 when HUD allocated windfall funds to the IHAs, thereby permitting Region VIII to legitimately determine that offset could be accomplished within the terms of the caveat to the Policy Notice. Under these conditions, the government cannot be held to have waived its right to recover the advanced subsidies. Plaintiffs point to nothing in the record evidencing waiver and only offer a bare assertion that four years is too long. That is not enough. *Pasadena Hosp. Ass'n v. United States*, 223 Ct.Cl. 72, 79–80, 618 F.2d 728, 731–32 (1980).

## CONCLUSION

Based upon an analysis of the facts and law presented by the parties in their cross-motions, the court is of the opinion that it is without jurisdiction to resolve the case. Assuming, *arguendo*, that the court had found the requisite jurisdiction, defendant cannot be equitably estopped from recovering the advanced subsidies nor did it waive its right to do so. Thus, defendant's motion for summary judgment is granted and plaintiffs' cross-motion for summary judg-

ment is denied. The Clerk is directed to enter judgment dismissing the Complaint. No costs.